## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED NATIONS on behalf of the　)
INDEPENDENT INQUIRY COMMITTEE　)
INTO THE UNITED NATIONS　)
OIL-FOR-FOOD PROGRAMME　)
825 Third Avenue, 15th Floor　)
New York, NY 10022　)

                      Plaintiff,

            v.

ROBERT H. PARTON

                    Defendant.　)

CASE NUMBER   1:05CV00917

JUDGE: Ricardo M. Urbina

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 05/09/2005

)
)
)
)
)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, the United Nations on behalf of the Independent Inquiry Committee Into the United Nations Oil-For-Food Programme, brings this action for declaratory and injunctive relief against Defendant Robert H. Parton, alleging as follows:

## INTRODUCTION

1.   This is an action to prevent a former investigator of the Independent Inquiry Committee into the United Nations Oil-for-Food Programme from violating his duty to protect the confidentiality of the Committee's investigatory materials, which, both by treaty and by federal statute, the United States has agreed is "inviolable." The unauthorized release of these materials flagrantly violates the privileges and immunities of the United Nations, potentially places at risk the lives of individuals who have cooperated with the Committee's investigation to date, and gravely jeopardizes the Committee's ability to complete its important mission.

2.   For several years, the United Nations oversaw the Oil-for-Food Programme, which permitted Iraq -- despite an economic embargo -- to sell oil to raise funds for humanitarian purposes. Because of concerns about the operation of the Programme, the United Nations established the Independent Inquiry Committee into the United Nations Oil-for-Food Programme, and appointed Paul Volcker, formerly Chairman of the Federal Reserve Board, to chair the Committee. (We refer to the Committee as the "Independent Inquiry Committee," "the Committee," or "IIC.")

3.   The Committee's investigation of the Oil-for-Food Programme is ongoing. Its inquiry to date has depended on its ability to assure witnesses, and national governments, that they could provide highly sensitive information to the Committee without fear of disclosure of the identity of the person providing the information. Completion of the Independent Inquiry Committee's mission will likewise require the cooperation of both witnesses and national governments.

4.   Defendant Robert H. Parton was, for a period of several months, a Senior Investigative Counsel for the Independent Inquiry Committee. Mr. Parton repeatedly agreed, in writing, to respect the confidentiality of the investigation. When he left his employment at the Committee, he repeatedly assured the Committee, in writing, that he had taken no Committee documents with him. In fact, however, Mr. Parton appears to have unlawfully removed large quantities of Independent Inquiry Committee materials.

5.   On information and belief, notwithstanding these agreements and certifications, Defendant Parton has already produced certain documents and communications from the Independent Inquiry Committee's investigative files to one congressional committee. Although he is required to notify the IIC immediately if any effort is made to obtain its investigative materials, Defendant Parton produced these materials without giving Plaintiff advance notice of his plan to do so.

6. Two congressional subpoenas seeking information from Defendant Parton are also currently pending. The first is from the Subcommittee on National Security, Emerging Threats, and International Relations of the House Committee on Government Reform, chaired by Rep. Christopher Shays ("House Government Reform Committee"). The second subpoena is from the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security & Government Affairs, chaired by Sen. Norm Coleman ("Senate Committee").  Both subpoenas require production of confidential records that Defendant Parton unlawfully removed from the Independent Inquiry Committee, that are protected as "inviolable" by treaty and statute, and whose release would gravely jeopardize the Committee's investigation. Production under the first subpoena is due at noon today, Monday, May 9, 2005, and production under the second is due on Thursday, May 12, 2005.

3

7.   The documents and communications that are the subject of the subpoenas are Plaintiff's property and, as such, are "inviolable" and "immune from search … and from confiscation." International Organizations Immunities Act, 22 U.S.C. § 288a(b)-(c).  *See also* Convention on the Privileges and Immunities of the United Nations, 21 U.S.T. 1418, T.I.A.S. No. 6900, art. 2, sec. 4 (signed Feb. 13, 1946 and ratified by the United States on April 29, 1970) ("The archives of the United Nations, and in general all documents belonging to it or held by it, shall be inviolable wherever located."). (The filing of this action is in no way intended to constitute, and should not be construed as, a waiver, express or implied, of the immunity of the United Nations or the Independent Inquiry Committee from judicial process under the IOIA or treaty.)

8.   Plaintiff's plan to disclose documents and communications apparently misappropriated from the Independent Inquiry Committee to two additional committees, if not halted by this Court, will irreparably harm Plaintiff in at least four ways:  (a) by destroying the "inviolability" of the Committee's archives, which are protected by both treaty and statute from precisely such disclosures, (b) by damaging the ability of the Committee to complete its investigation by deterring witnesses (and national governments) from cooperating with the Committee in the future, and by disclosing the Committee's work product before its investigation is complete, (c) by damaging the reputation of the United Nations concerning its ability to provide reliable assurances to witnesses about the use that will be made of information provided in confidential investigations, and (d) by placing at risk the lives and safety of individuals who have cooperated with the Independent Inquiry Committee under promises of confidentiality.

## JURISDICTION AND VENUE

9.   This Court has jurisdiction over this case pursuant to the International Organization Immunities Act, 59 Stat. 669, 22 U.S.C. § 288a, and pursuant to 28 U.S.C. §§ 1331 & 2201.

10.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).   This action is not founded upon diversity of citizenship and the District of Columbia is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated.   Specifically, the production of documents and correspondence in accordance with the subpoena would occur in the District of Columbia.

## PARTIES

11.   Plaintiff United Nations is an international organization aimed at peacekeeping, international cooperation, and security.   The United States is a member of the United Nations and, as such, is a signatory to the United Nations Charter, an international treaty.

12.   The Independent Inquiry Committee into the United Nations Oil-for-Food Programme, on whose behalf the United Nations brings this suit, was appointed in April 2004 by the Secretary-General of the United Nations to independently investigate the administration and management of the Oil-for-Food Programme in Iraq.   The United Nations Security Council unanimously adopted Resolution 1538 (2004), which endorsed the investigation.

13.   Defendant Robert H. Parton was employed by the Independent Inquiry Committee as "senior investigative counsel" from August 2004 through his resignation in April 2005. Defendant Parton entered into a letter agreement of employment and a consultant contract, each

of which specified that he not communicate externally any information that he learned in his capacity as investigator.  Upon his resignation, Defendant Parton certified in writing that he did not retain any documents or information related to his work at the Committee.

## BACKGROUND

### United Nations IIC into the Oil-for-Food Programme

14.    The Oil-for-Food Programme arose as part of an effort to address humanitarian concerns about the impact on the people of Iraq of the comprehensive economic sanctions that were imposed against Iraq following its invasion of Kuwait in 1990.  From approximately 1996 to 2003, the Programme permitted Iraq to sell oil, to have the proceeds of oil sales deposited into a UN-controlled escrow account, and to use funds deposited to the escrow account to purchase food and other civilian goods.  The Programme terminated in 2003 in light of the onset of military activities in Iraq that led to the fall of the regime of Saddam Hussein.

15.  By early 2004, numerous media reports had surfaced concerning corruption and other irregularities in the inception and administration of the Programme.  Among the issues raised in media reports concerned the conduct of Secretary-General Kofi Annan.  Questions were raised about the propriety of the United Nations' award of a large contract under the Programme to a goods inspection company (Cotecna Inspection SA) that employed Kojo Annan, the son of the Secretary-General.

16.  By April 2004, the Secretary-General decided to designate a three-member committee of persons not employed by the United Nations to conduct an independent investigation of the management and administration of the Oil-for-Food Programme.  The Secretary-General appointed Paul A. Volcker (formerly chairman of the Federal Reserve Board)

6

as the Committee's chair.  In addition, the Secretary-General appointed as members Richard Goldstone (former justice of the Constitutional Court of South Africa and presently a visiting professor of law at Harvard Law School) and Mark Pieth (a professor of law at the University of Basel in Switzerland).

17.  On April 22, 2004, the members of the United Nations Security Council unanimously passed Resolution 1538 endorsing the Secretary-General's appointment of an "independent high-level inquiry" and calling upon all Member States of the United Nations "to cooperate fully by all appropriate means with the inquiry."  The United States voted in favor of Resolution 1538.

18.  To date, IIC investigators have conducted more than 400 witness interviews in more than twenty countries, and the IIC has reviewed hundreds of thousands of documents in paper and electronic form.

19.  Several committees of the United States Congress have also initiated investigations concerning the Oil-for-Food Programme:  (a) the House Committee on International Relations (chaired by Rep. Henry Hyde), (b) the House Subcommittee on National Security, Emerging Threats and International Relations of the Committee on Government Reform (chaired by Rep. Christopher Shays), and (c) the Senate Permanent Subcommittee on Investigations (chaired by Sen. Norm Coleman) of the Senate Committee on Homeland Security & Government Affairs.

Legal Protections from Subpoena or Seizure of the Documents and Communications of the United Nations IIC.

20.  In the absence of an express waiver by the United Nations, the archives of the United Nations are "inviolable" and the property and assets of the United Nations "*wherever located*

*and by whomsoever held*, shall be immune from search ... and from confiscation." 22 U.S.C. 288a(b) and (c) (emphasis added). Similarly, the Convention on the Privileges and Immunities of the United Nations, 21 U.S.T. 1418, T.I.A.S. No. 6900, art. 2, sec. 4 (signed Feb. 13, 1946 and ratified by the United States on April 29, 1970) provides that "[t]he archives of the United Nations, and in general all documents belonging to it or held by it, shall be inviolable wherever located."

21.  The Convention further provides that "[t]he property and assets of the United Nations, *wherever located and by whomsoever held*, shall be immune from search, requisition, confiscation, expropriation and any other form of interference, whether by executive, administrative, judicial or legislative action." *Id.*, sec. 3 (emphasis added).

22.  Under the terms of Article VI of the Convention on Privileges and Immunities, "experts on mission" "shall be accorded ... inviolability for all papers and documents." *See* Convention, art. VI, sec. 22(c). Staff members of the Independent Inquiry Committee have been designated by the United Nations as "experts on mission" within the meaning of Article VI of the Convention.

## Defendant Parton's Confidentiality Obligations

23.  On July 6, 2004, Defendant Parton entered into a letter agreement of employment with the Independent Inquiry Committee as "Senior Investigative Counsel" and began service on August 9, 2004. Defendant Parton previously served as a law enforcement agent with the Federal Bureau of Investigation and has a law degree from Cornell University.

24. On August 18, 2004, shortly after he began his service at the Committee, Mr. Parton signed an agreement with the United Nations to perform services as Senior Investigative Counsel to the Independent Inquiry Committee. *See* Contract for Consultant (signed Aug. 18, 2004). One of the express conditions of employment that he accepted upon signing the contract was that he "shall not communicate at any time to the media or to any institution, person, Government or other authority external to the United Nations any information that has not been made public and which has become known to [him] by reason of [his] association with the United Nations." The agreement further provided that "[t]hese obligations do not lapse upon cessation of service with the United Nations." This agreement expired on December 31, 2004, and Robert Parton signed a new agreement on January 18, 2005.

25. On November 9, 2004, Defendant Parton signed the IIC's standard "Staff Confidentiality Agreement." The Confidentiality Agreement categorically forbade Defendant Parton from disclosing the Independent Inquiry Committee's confidential information to any third party: "I will not disclose or cause to be disclosed any information related to this inquiry to person outside of the IIC, except in strict furtherance of my investigative duties and responsibilities."

26. The Agreement contained multiple provisions prohibiting Mr. Parton from disclosing the Committee's documents and information to third parties following his employment. For example, Mr. Parton agreed that "[b]oth during and following my employment with the IIC, all information in whatever form relating to the inquiry, including but not limited to non-public evidence, documents, records, reports, and witness statements will not be used by me for any purpose outside of the IIC's inquiry." He further agreed "[at] the conclusion of my employment with the IIC, I will not retain, copy in any form, nor remove from IIC premises any

9

non-public documents, records or other information relating to the inquiry." Defendant Parton also agreed to advise the IIC "immediately if any third party attempts to obtain from me, by legal process or otherwise, any such information."

### Defendant Parton's Employment at the Committee

27. While employed as Senior Investigative Counsel, Robert Parton was in charge of one of the investigation teams within the Independent Inquiry Committee.

28. Robert Parton's investigation team focused on matters relating to the United Nations' selection of certain contractors to conduct inspection and banking services for the Oil-for-Food Programme. His part of the investigation included review of the conduct of the Secretary-General in connection with the award of an inspection contract to Cotecna Inspection SA, which employed the Secretary-General's son.

29. As a senior-level investigator with the Committee, Defendant Parton had access to the vast majority of records generated and obtained in connection with the Committee's investigation, including materials from many aspects of the investigation that Mr. Parton did not personally handle.

30. Among the documents accessible to Defendant Parton were reports of interviews with dozens of witnesses within Iraq. As the Committee pointed out in its first Interim Report, disclosure of the names of Iraqi witnesses who have provided information to the Committee "would jeopardize their health and safety," and for that reason the Committee has kept this information strictly confidential. In addition, several national governments have provided

valuable information to the Committee only on condition and with the assurance that individual names of persons interviewed would not be subject to public disclosure.

31.  On March 29, 2005, the Committee issued its Second Interim Report.  The report focused on the Secretary-General and the selection of Cotecna Inspection SA  as a contractor under the Programme.

32.  Defendant Parton announced his intention to resign and his last day of employment with the Committee was on April 12, 2005—two weeks after issuance of the Committee's Second Interim Report.

33.  On April 12, Defendant Parton also met with the Committee's controller for a "separation" meeting.  At this meeting, he signed a "Separation from Duties Check out List." Mr. Parton certified that he had not retained IIC documents:  "I further certify that no documents or information related to the work of the IIC are in my possession outside of the premises of the IIC."

34.  On the same day, Defendant Parton sent to Committee Counsel Susan Ringler an email noting that he had arranged with the Committee's information technology manager to delete any IIC documents or files from his personal laptop computer and that he did not have any thumb-drives (external storage devices) on which he had stored IIC files or documents. Defendant Parton also left a handwritten post-it note to the IIC's controller stating: "Please note that Phillipe [the IIC's information technology officer] cleaned my harddrive this afternoon."

<u>Defendant Parton's Disclosure of Privileged Documents and Communications without
Prior Notice to the Independent Inquiry Committee and in Contravention of Federal and
International Law.</u>

35.  After Mr. Parton left the Committee, media reports soon surfaced that he had done so because of his disagreement with aspects of the Committee's second interim report.

36.  Defendant Parton informed the Committee that he had obtained legal counsel, Lanny Davis of the law firm of Orrick, Herrington & Sutcliffe LLP, in Washington, D.C.

37.  Mr. Davis informed the Committee on April 26, 2004, that he had received requests from Congressional committees for Robert Parton to appear voluntarily to discuss his work for the Committee and inquiries about whether Defendant Parton would accept service of a subpoena.  The Committee advised Mr. Davis of the protection accorded to such information under the Convention and of Defendant Parton's confidentiality agreement with the Independent Inquiry Committee.  The Committee also told Mr. Davis that the United Nations would have to affirmatively waive any privileges and immunities before Defendant Parton could share information with Congress.  Mr. Davis gave no indication that Defendant Parton possessed confidential documents of the Independent Inquiry Committee.

38.  On the morning of May 2, 2005, Mr. Davis wrote to the Committee asking "[d]oes the IIC instruct Mr. Parton to defy any subpoena that the United States Congress issues to him in connection with his work for the IIC?"  The letter did not state that Defendant Parton had actually been served with any subpoena from Congress.  Mr. Davis sent a similar letter to Bruce Rashkow of the United Nations Office of Legal Affairs.

39.  Mr. Rashkow replied on May 2, 2005 by letter to Mr. Davis advising in relevant part that "[a]ll activities of the [Independent Inquiry] Committee and its staff in the performance of

their duties for the Committee are immune from legal process," that "[i]t is for the Organization [the United Nations] to waive such privileges and immunities," and that "if Mr. Parton were to receive legal process from a United States Congressional Committee, or any other governmental entity, such process should be immediately forwarded to the United Nations." Mr. Rashkow's letter added that "[t]he Organization would respond accordingly after consulting with the Independent Inquiry Committee."

40.   The next day, the Committee's Counsel (Ms. Ringler) wrote to Mr. Davis referring to the letter of Mr. Rashkow and reminding him of "Mr. Parton's confidentiality agreement with the IIC and the protections afforded to the IIC Committee members and staff in the performance of the investigation." The Committee's Counsel also inquired what response, if any, he had made to any requests from Congress.

41.   On the following day, May 4, Mr. Davis faxed a letter to Ms. Ringler and Mr. Rashkow disclosing that Defendant Parton had previously been served with a subpoena on Friday, April 29, 2005, by the Committee on International Relations of the United States House of Representatives.  Mr. Davis's letter included a copy of the subpoena reflecting that Mr. Davis had received service of the subpoena at his office in Washington, D.C., and that the subpoena commanded production of "[a]ll records produced by Mr. Parton or in his possession relating to the Independent Inquiry Committee into the United Nations Oil-for-Food Programme . . . ." Mr. Davis's letter stated that Defendant Parton had complied with the subpoena.

42.   Mr. Davis's letter did not describe what was produced by Defendant Parton in response to the subpoena, and he has yet to respond to the IIC's request for a list of documents produced. According to media reports, however, the subpoena production includes "more than a

half-dozen boxes of documents." *See* "Volcker Asks Congress to Back Off," Washington Times (May 6, 2005); *see also* "Volcker Lawyer Asks U.N. to Block U.S. Subpoenas," FOXNews.com (May 7, 2005) (noting that "boxes" of documents were produced in response to subpoena).

43. As noted above, Robert Parton was obliged by the terms of his Confidentiality Agreement "immediately" to notify the Committee if he were served with legal process seeking confidential information of the Committee. The subpoena was served on April 29, but the Committee was not advised of the subpoena until *after* Robert Parton disclosed documents in response to the subpoena.

44. Mr. Davis's letter of May 4 states that he did not earlier disclose the subpoena to the Independent Inquiry Committee because Robert Parton was "[u]nder threat of being held in contempt of Congress" if he did so. Neither the subpoena nor the attached instructions contain any directive prohibiting Defendant Parton from disclosing the fact of the subpoena to the United Nations or the IIC. The federal "contempt of Congress" statute does not proscribe a witness from disclosing the fact or contents of a subpoena to a third party. *See* 2 U.S.C. 192. Similarly, the subpoena-related provisions of the Standing Rules of the House of Representatives (Rule XI, clause 2) and the Rules of the House Committee on International Relations (Rule 22) do not prohibit a witness from disclosing to a third party that he has been served with a subpoena.

45. Late in the evening of May 4, 2005, Congressman Henry Hyde—the Chairman of the House International Relations Committee—spoke by telephone with Paul Volcker. According to Mr. Volcker, Congressman Hyde denied that his committee had issued any such threat.

<u>The Pending Subpoenas</u>

46. There are presently pending two additional congressional subpoenas seeking information from Defendant Parton. The first is a subpoena from the Subcommittee on National Security, Emerging Threats and International Relations of the Committee of the Committee on Government Reform. This subpoena was apparently served by fax on Defendant's counsel, Lanny Davis, on May 5, 2005, and it commands the production of "[a]ll records referring or relating to the Independent Inquiry Committee into the United Nations Oil-for-Food Programme" at noon on May 9, 2005.

47. The second subpoena has issued from the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security & Government Affairs. This subpoena commands production by Defendant Parton by 10:00 a.m. on May 12, 2005, of documents relating to his employment and "relating to the subject matter that you were investigating during the course of your employment at the IIC." The subpoena further commands Defendant Parton's appearance as a witness to testify before the Senate Subcommittee at 10:00 a.m. on May 12.

48. On May 6, 2005, Paul Volcker issued a statement to the press proposing to release Defendant Parton from his obligation of confidentiality to make a public statement concerning his disagreement with the Independent Inquiry Committee's report, on the condition that the congressional committees withdraw their subpoenas and return documents that have been subpoenaed. Mr. Volcker stated his "overriding concern ... is to safeguard the security of witnesses whose lives quite literally would be at risk if information about their cooperation became known."

## The Need For Injunctive Relief

49.  Irreparable harm will occur if Defendant Parton is not prohibited from further disclosing the documents wrongly taken from the Independent Inquiry Committee. First, unauthorized disclosure of its investigative files will destroy the "inviolability" of the United Nations' archives, which are protected by both treaty and statute from exactly this type of disclosures. Second, it will impair the ability of the Committee to complete its investigation by discouraging witnesses (and governments) from cooperating with the Committee in the future. Third, it will harm the reputation of the United Nations with respect to its ability to assure informants about the use that will be made of sensitive information provided in confidential investigations. Fourth, it will place at risk the lives and safety of Iraqi citizens who have provided information to the Committee under promises of confidentiality.

50.  Plaintiff has no adequate remedy at law; the sole remedy available is to protect the confidentiality of the Independent Inquiry Committee's documents and communications in accordance with federal and international law by barring Defendant Parton from wrongfully disclosing any misappropriated documents or confidential communications to others.

51.  The fact that Defendant Parton has already supplied the documents to the Hyde Committee does not eliminate the threat of irreparable harm from future dissemination; the more broadly this information is made available, the more complete the breach of confidentiality and the more likely the potential for the harms described above to accrue. The Committee continues to seek to work with the Hyde Committee to obtain the return of these unlawfully produced documents.

## PLAINTIFF'S CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Breach of Contract and for Declaratory and Injunctive Relief)

52.   Plaintiff realleges and incorporates by reference paragraphs 1 through 51.

53.   The Independent Inquiry Committee and Defendant Robert Parton entered into a letter agreement of employment on July 6, 2004 under which Defendant Robert Parton was hired by the IIC as a "Senior Investigative Counsel."

54.   On August 18, 2004, shortly after he began his service with the IIC, Defendant Parton signed an agreement with Plaintiff United Nations to perform services as Senior Investigative Counsel for the Committee.  One of the express terms of his employment that Defendant Parton accepted was that he "shall not communicate at any time to the media or to any institution, person, Government or other authority external to the United Nations any information that has not been made public and which has become known to [him] by reason of [his] association with the United Nations."  The agreement further provided that "[t]hese obligations do not lapse upon cessation of service with the United Nations."  This agreement expired on December 31, 2004; Mr. Parton signed a new agreement on January 18, 2005 that contains the same conditions of service.

55.   On November 9, 2004, Defendant Robert Parton signed the IIC's standard "Staff Confidentiality Agreement."  The Confidentiality Agreement categorically forbade Defendant Robert Parton from disclosing the IIC's confidential information to any third party.  In signing the Confidentiality Agreement, Defendant Robert Parton agreed that "I will not disclose or cause to disclose any information related to [the IIC's] inquiry to any person outside of the IIC, except

in strict furtherance of my investigative duties and responsibilities." In signing the Confidentiality Agreement, Defendant Robert Parton agreed that "[b]oth during and following my employment with the IIC, all information in whatever form relating to the inquiry, including but not limited to non-public evidence, documents, records, reports, and witness statements will not be used by me for any purpose outside of the IIC's inquiry." Upon information and belief, Defendant Parton has, without authorization, disclosed or caused to be disclosed information relating to the IIC investigation to third parties. These disclosures were not in furtherance of Defendant's investigative duties and responsibilities for the Committee. Defendant's making of those disclosures constitute material breaches of the non-disclosure provisions of the Confidentiality Agreement.

56.    In signing the Confidentiality Agreement, Defendant agreed that "at the conclusion of [his] employment with the IIC, [he] will not retain, copy in any form, nor remove from IIC premises any non-public documents, records, or other information relating to the inquiry." Upon information and belief, Defendant has copied, removed from Committee premises, and retained non-public records or other information relating to the Inquiry. These acts were not in furtherance of Defendant's investigative duties and responsibilities for the Committee. Defendant's copying, removal, and retention of Committee documents constitute material breaches of the non-retention provisions of the Confidentiality Agreement.

57.    In signing the Confidentiality Agreement, Defendant Parton also agreed to advise the Committee "immediately if any third party attempt[ed] to obtain from [him], by legal process or otherwise, any such information." Upon information and belief, Defendant Parton received a subpoena from the Committee on International Relations of the U.S. House of Representatives on April 29, 2005 for all documents in his possession relating to the IIC's investigation. He did

18

not advise the Committee that he had received the subpoena until May 4, 2005. Defendant's five-day delay in advising the IIC about the subpoena issued by the Committee on International Relations of the U.S. House of Representatives constituted a material breach of the third-party disclosure provision of the Confidentiality Agreement.

58. As a result of Defendant's multiple material breaches of the Confidentiality Agreement, the Committee's ability to carry on its investigation has been hindered in several important ways. Much of the Committee's ability to collect information and documents rests on its ability to assure witnesses and suppliers of documents that their disclosures will be treated confidentially. By compromising the confidentiality of the Committee's investigation, Defendant's actions have discouraged and will discourage witnesses and persons, institutions, and governments with information useful for the Committee's investigation from sharing that information with the Committee. Witnesses whose identities may be revealed as a result of Defendant's disclosures may be placed in physical danger as a result of the disclosures. If any of them are harmed, that will only further undermine the Committee's ability to get cooperation from witnesses who fear disclosure of their identities.

59. Wherefore, Plaintiff requests this Court to declare that (i) Defendant's disclosures of Committee documents, (ii) Defendant's failure to advise the IIC immediately of his receipt of the April 29, 2005 subpoena from the Committee on International Relations of the U.S. House of Representatives, and (iii) Defendant's apparent failure to return all Committee documents to the IIC, each constituted material breaches of the Confidentiality Agreement. Plaintiff further requests this Court to enjoin Defendant from breaching the Confidentiality Agreement by additional disclosures of Committee documents or by failing to advise the Committee of additional requests from third parties for documents or information acquired in the course of his

employment with the Committee or in any other respect. Plaintiff also requests that the Court order Defendant to return immediately all Committee materials in his possession (or the possession of his agents) to Plaintiff.

## SECOND CLAIM FOR RELIEF
### (Conversion)

60. Plaintiff realleges and incorporates by reference paragraphs 1 through 59.

61. Plaintiff is the owner, entitled to take immediate possession, of all documents, recordings, and other materials created by its employees in the scope of their employment. Plaintiff is also the owner, entitled to take immediate possession, of all documents, recordings, and other materials collected by the Independent Inquiry Committee in the course of its investigation.

62. Defendant Robert Parton has exercised dominion over documents, recordings, and other materials owned by Plaintiff and the Committee by copying, retaining, and disclosing them to third parties. Those actions were in no way authorized by Plaintiff.

63. Defendant's exercise of dominion over documents, recordings, and other materials owned by Plaintiff and the Committee has interfered with Plaintiff's and the Committee's right to maintain exclusive control over the documents, recordings, and other materials and Plaintiff's and the Committee's right to maintain the confidentiality of the documents, recordings, and other materials.

64. Wherefore, Plaintiff requests this Court to declare that Defendant has illegally converted documents, recordings, and other materials owned by Plaintiff and the Committee and

prohibit Plaintiff from engaging in any further acts of conversion, and order Defendant to return all such materials to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United Nations on behalf of the International Inquiry Committee into the United Nations Oil-for-Food Programme, pray for preliminary and permanent relief and a judgment against Defendant Robert Parton as follows:

(1)    declaring that Defendant and his agents and assigns are prohibited from disclosing the communications, documents or other confidential information of the Independent Inquiry Committee;

(2)    declaring that Defendant has violated the contractual terms of his employment and other contracts by retaining these documents and communications after his resignation and by providing these communications and documents to the Hyde Committee;

(3)    ordering Defendant to return the documents and communications, and any copies, to the Independent Inquiry Committee;

(4)    enjoining Defendant from engaging in any further violations of his obligations to Plaintiff;

(5)    ordering Defendant to specifically perform his duties under his contracts with the Committee;

(6)    awarding Plaintiff, as appropriate, their costs, attorneys' fees, and other disbursements for this action; and

(7)    granting Plaintiff such other and further relief as this Court deems just and proper.

21

Respectfully submitted,

Seth P. Waxman
(D.C. Bar No. 257337)

Randolph D. Moss
(D.C. Bar No. 417749)

Thomas P. Olson
(D.C. Bar No. 389220)

WILMER CUTLER PICKERING
HALE and DORR LLP
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

May 9, 2005

*Counsel for Plaintiff*
*United Nations on behalf of the*
*International Inquiry*
*Committee into the*
*United Nations*
*Oil-for-Food Programme.*